1        A    Yes.

2             MR. BLEAKLEY:   How can the witness know

3    whether they're more accurate?

4             THE COURT:   I'll overrule the objection.

5    That answer may stand.

6        Q    Before -- according to Dr. Kassicieh's

7    records, before you took Meridia, your weight was

8    back up to 195 on the 19th of August 1998.  Does

9    that comport with your memory?

10       A    Yes, sir.

11       Q    These records indicate you took Meridia at

12   his instruction in July and September of 2000.  Does

13   that comport with your memory?

14       A    Yes.

15       Q    Okay.  You were also asked why you brought

16   this lawsuit, even though Dr. Narins couldn't tell

17   you whether or not your mitral valve thickening and

18   your regurgitation and your pulmonary hypertension

19   were related to Redux or not.

20            MR. BLEAKLEY:   Objection, Your Honor.   I

21   did not ask that question.

22            THE COURT:   What's the question you want

23   to ask?

24            MR. MILLER:   The question is, I want to

25   show the witness a document and ask if this document

```
 1    had anything to do with her filing a lawsuit.

 2              THE COURT:  Show the document to

 3    Mr. Bleakley.

 4              MR. BLEAKLEY:  Yes, I have an objection.

 5              THE COURT:  You want to approach the

 6    bench?

 7              (At the bench.)

 8              THE COURT:  Okay.  Your objection.

 9              MR. BLEAKLEY:  My objection is that it's

10    hearsay, that there's no foundation, that it's

11    irrelevant what some member of the New Mexico

12    Legislature thought was an appropriate thing to

13    request in the form of a memorial or a resolution.

14              THE COURT:  Okay.  Mr. Miller.

15              MR. MILLER:  I want to make a proffer that

16    the witness read that before she filed the lawsuit

17    and it was one of the reasons she decided to file a

18    lawsuit.  The suggestion has been raised that she

19    did it even though she wasn't injured because she

20    was, you know, trying to do something that was less

21    than admirable, and I think that refutes that quite

22    handily.

23              THE COURT:  I think it's a fair question

24    to ask her why she decided to file the lawsuit.  At

25    this point she's exhibited no lack of memory on that
```

1    point, so providing her with a document is

2    unnecessary.  But I do agree that on cross the

3    question raised and issue as to why she filed the

4    lawsuit when she did.  So you may ask her.

5              MR. MILLER:  Thank you, Your Honor.

6              (In open court.)

7       Q    I'm not going to show you this document,

8    but I'm going to ask you, why did you file the

9    lawsuit?

10      A    I filed the lawsuit because Redux damaged

11   me, and I'm not going to have the same quality of

12   life as before I took the product.

13             MR. MILLER:  Fair enough.  Thank you for

14   your time.

15             That's the end of the witness, Your Honor.

16             THE COURT:  Thank you, ma'am.  You may

17   step down.

18             Members of the jury, I think we'll go

19   ahead and take our morning recess before we begin

20   the next witness.  Same caution I give you each

21   time.  Don't discuss the matter over this break.

22   Don't make up your mind.  You do have additional

23   evidence to hear.

24             Please rise while the jury goes out.

25             (Whereupon, the jury left the room.)

Page 439

```
 1                  (A recess was taken.)

 2                  THE COURT:  You may be seated in court.

 3                  We're now on the record, counsel and

 4     parties present, outside the presence of the jury.

 5     Close that door there, if we could.  There we go.

 6                  Actually, I have had a chance now to look

 7     at Mr. Anaya's deposition, and you want my rulings

 8     on that.

 9                  MR. MILLER:  Yes, please, Your Honor.

10                  THE COURT:  I'm looking at Mr. Miller's

11     cover letter as far as what the objections are.  So

12     I'll rule on them as follows.

13                  The objection that begins on page 31, line

14     6, that objection is overruled.  The objection that

15     begins on 39, line 7, and includes some on page 40,

16     as well -- that objection is sustained.  The

17     objection that begins on page 44, line 1 -- that

18     objection is sustained.  The objection that begins

19     on page 46, line 11, and also goes on to page 47,

20     that objection is overruled.  The objection that

21     begins on page 55, line 10, is sustained.  The

22     objection that begins on page 62, line 5, is

23     overruled.

24                  So I don't know if you plan to present

25     that next, but that will give you that information.
```

1      MR. MILLER:  Yes, Your Honor, we do.

2  We'll present that, and then Joseph Bathish, which

3  Your Honor has already ruled on by video, which I

4  understand is ready to go, and then we'll go from

5  there.

6      THE COURT:  Is this on CD-ROM?

7      MR. MILLER:  We're going to read that,

8  Your Honor.  I don't know who you want to be the

9  witness.  We can have somebody else, unless the

10  Court has somebody else they want to use.

11      THE COURT:  I don't have anyone.

12      MR. MILLER:  We can use Mr. Altman.

13      THE COURT:  We can provide someone.

14      MR. MILLER:  Or anyone else.

15      THE COURT:  So you'll read the questions,

16  Mr. Miller, and someone will stand in and provide

17  Mr. Anaya's answers?

18      MR. MILLER:  Yes, Your Honor.

19      THE COURT:  All right.  Anything else,

20  then?  Okay.  We'll break for about ten minutes,

21  then, and come back to continue with evidence.

22      (A recess was taken from 10:23 to 10:39.)

23      THE COURT:  All right, members of the

24  jury, ready to continue with evidence.

25      Mr. Miller, your next witness.

```
 1              MR. MILLER:  Thank you, Your Honor.  By
 2    deposition we will call Francisco Anaya.
 3              THE COURT:  Members of the jury, we're
 4    going to hear some additional deposition testimony,
 5    and this is deposition testimony of Francisco Anaya.
 6    This was not preserved on videotape.  It was
 7    preserved in writing, however.  So what we're going
 8    to do in this case is have the evidence presented in
 9    a question-and-answer form, the same way that it
10    occurred at the deposition.
11              Mr. Miller, you're going to ask the
12    questions.
13              MR. MILLER:  Yes, and Mr. Altman is going
14    to read the answers of Mr. Anaya.
15              THE COURT:  Mr. Altman, have a seat up
16    here.
17              MR. MILLER:  We only have one copy
18    appropriately marked, so with the Court's permission
19    I'll look over his shoulder.
20              THE COURT:  Why don't we do it up here.
21    That will be fine.
22              So this is not Mr. Anaya.  This is
23    Mr. Altman, but he's going to play the role of
24    Mr. Anaya, and give the answers that Mr. Anaya gave
25    at his deposition.
```

Josephine Garcia v. Wyeth-Ayerst                    Volume 3, A.M. Session

Page 442

```
 1              MR. MILLER:  And I'll be the questioner.

 2              (Reading.)

 3      Q       Good morning.

 4      A       Good morning.

 5      Q       Your name, sir?

 6      A       My name is Francis Anaya.

 7              THE COURT:  Hold on just a second.  We

 8      also, like the other deposition testimony, can go

 9      off the record for this.  I see the court reporter

10      was taking down the answers.  Since this has already

11      been recorded, we'll go off the record, and then

12      once it's completed, we'll come back on the record.

13      So we'll be in recess from the record.

14              (Off the record.)

15              THE COURT:  Now back on the record.  For

16      the record, the Court has heard the deposition

17      excerpts of Mr. Anaya, and I have marked that as

18      Court's Exhibit 5.  Additional evidence?

19              MR. MILLER:  We have a video deposition of

20      Joseph Bathish.  He's an employee of American Home

21      Products.  It's about 37 minutes along.

22              THE COURT:  Okay.  Members of the jury,

23      then we'll be moving to the deposition testimony of

24      Joseph Bathish.  And again, this was on video, so

25      we'll once again go off the record.  I'll mark this
```

1    as Court's Exhibit 6, and the jury will hear the

2    portions of that deposition.  We'll go off the

3    record.

4              (Off the record.)

5              MR. MILLER:  Your Honor, we have one more

6    video.

7              THE COURT:  Hold on.  We'll go back on the

8    record at this point.  Let me ask counsel to

9    approach for just a moment.

10              (At the bench.)

11              THE COURT:  I want to make sure the

12    designations are right.  I then have the

13    counter-designations at the end.  Will they be

14    interspersed throughout?

15              MR. MILLER:  I think that was the Court's

16    ruling they were all interspersed.  That's my

17    understanding.

18              THE COURT:  Okay.  I just wanted to be

19    sure.  Okay.  Thank you.

20              (In open court.)

21              THE COURT:  All right.  Additional

22    evidence on behalf of the plaintiff?

23              MR. MILLER:  Your Honor, members of the

24    jury, we have one more video witness we can do

25    before lunch, about 30 minutes, and a live witness

1    right after lunch.  We'd like to call Roger

2    Ilingworth by video now.

3            THE COURT:  We'll go ahead and proceed

4    with Mr. Ilingworth.  I think we'll just go until

5    noon and break at that point.

6            MR. MILLER:  That's fine.

7            THE COURT:  If we need to hear the last

8    portion of it immediately after lunch, we'll do so.

9            MR. MILLER:  This is Dr. Ilingworth.

10           THE COURT:  Once again, we'll go off the

11   record at this point to hear that deposition

12   testimony which will be marked as Court's Exhibit 7.

13   We're off the record.

14           (Off the record.)

15           THE COURT:  Counsel, let me ask you to

16   stop there.  We're back on the record.  For the

17   record, we're up to page 73, line 2, of

18   Dr. Ilingworth's deposition, and we'll complete that

19   after lunch.

20           Members of the jury, we'll break for lunch

21   at this point.  Same caution.  Don't discuss the

22   matter with anyone.  Don't make up your mind.  You

23   have additional evidence to hear.  If you could once

24   again report back upstairs at 20 minutes after 1:00,

25   we'll start promptly with evidence at 1:30.

1          Please rise while the jury goes out.

2          (Whereupon, the jury left the room.)

3          THE COURT:  You may be seated in court.

4    Now on the record outside the presence of the jury,

5    counsel and parties present, I guess we have seven

6    or more minutes of that deposition.  Who else do we

7    anticipate this afternoon, Mr. Miller?

8          MR. MILLER:  We have a life care planner

9    next, and we'd --

10          THE COURT:  Who is that?

11          MR. MILLER:  Her name is Julia Selah.  She

12    just married.  I'm probably not pronouncing it

13    right.  But Julia Selah.

14          And then we were going to play a few more

15    videos.  If the Court could rule on objections on

16    some that have been proffered, we don't have any

17    downtime.

18          THE COURT:  Who do you anticipate next?

19          MR. MILLER:  Three that would be for

20    tomorrow that would be way better if we could play

21    them today, because I anticipate they'll be longer

22    with Dr. MoyT than we had originally hoped.  Carrie

23    Smith-Cox, Ron Notvest, and Fred Wilson.  I think

24    the Court has all three of those.

25          THE COURT:  I don't think I have Wilson

```
 1   yet.
 2              MR. MILLER:  Ron Notvest and Carrie
 3   Smith-Cox I know the Court has and --
 4              MR. GROSSI:  We also have Mr. Levin.
 5              MR. MILLER:  And Mr. Levin, Your Honor.  I
 6   think that would well get us through the rest of the
 7   day.
 8              THE COURT:  All right.  I'll do as much as
 9   I can.  So the first one I should review is
10   Smith-Cox, then Notvest, then Levin, in that order?
11              MR. MILLER:  Yes, Your Honor.
12              THE COURT:  Is that the way you want them?
13   Okay, I'll do what I can on those three over the
14   lunch hour and try to rule on them right after
15   lunch.
16              MR. MILLER:  Axel Olsen, as well, Your
17   Honor, if the Court could look at that.
18              THE COURT:  I don't have it.  I don't have
19   Olsen yet.
20              MR. MILLER:  Then the ones we've
21   discussed.
22              THE COURT:  So those three are the ones I
23   should take a look at?  Okay.
24              MR. MILLER:  I think that will take us --
25   coming back at 1:30, by the time we do the life care
```

1    planner, I think that will take us through the

2    afternoon.

3            THE COURT:  Okay.  Other matters, then,

4    plaintiff's counsel would like to raise before we

5    break for lunch?

6            MR. MILLER:  No.

7            THE COURT:  Defense?

8            MR. BLEAKLEY:  Your Honor, I would note,

9    as you read those depositions, you're going to see

10   lots more about black boxes and PPH and Pondimin,

11   all of which is cumulative and, we believe, unduly

12   prejudicial at this point.

13           THE COURT:  Okay.

14           MR. MILLER:  Your Honor, if I could

15   respond.

16           THE COURT:  Sure.

17           MR. MILLER:  I don't think you're going to

18   see a lot about it.  I think you're going to see

19   some about it in Fred Wilson --

20           THE COURT:  I don't have Wilson.

21           MR. MILLER:  I don't believe you'll see

22   any of it.

23           MR. BLEAKLEY:  You'll see it in Notvest.

24           MR. MILLER:  Not much.

25           MR. BLEAKLEY:  In Levin, and you're going

1    to see it in Smith-Cox.  All three.

2              THE COURT:  I'm certainly aware of that

3    objection, as we move along.  I have cut some things

4    out already, so I'll keep that in mind.

5              MR. MILLER:  And in the unlikely event we

6    get through all the videos, I think we ought to put

7    on Mr. Garcia.  It's incomprehensible that they are

8    not ready to cross-examine him.  In lieu of having

9    downtime --

10             THE COURT:  I have got to say, I can't

11   imagine Mr. Garcia would take a tremendous amount of

12   preparation, but maybe he's going to say things that

13   I don't anticipate.  I don't know.

14             MR. GROSSI:  Your Honor, I'm just

15   interested in something, because counsel seems to be

16   anticipating something that I would be very

17   surprised at, that the life care planner will take

18   less than an hour between the two of us.

19             MR. MILLER:  I'm pretty sure an hour, hour

20   and a half.  I don't think it will be that long.

21             MR. GROSSI:  That's my point, Your Honor,

22   if it's an hour, hour and a half, you're already way

23   beyond --

24             MR. MILLER:  It's my intention to do the

25   life care planner and the cuts first.  I just didn't

```
 1    want to have any downtime.

 2              THE COURT:  Okay.  Well, we'll see where

 3    we are at the afternoon break.  If it looks

 4    promising to get to Mr. Garcia at that point,

 5    perhaps defense counsel could give their attention

 6    to that so they could cross-examine him.  But it's

 7    probably unlikely we'll reach that point.  I'll

 8    attempt to get these three done, if I can.  Anything

 9    else over the break?

10              Okay, if you could report back at about 20

11    minutes after 1:00, we'll plan on starting at 1:30.

12    We'll be in recess.

13              (Court was in recess at 12:00 noon.)

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 8

06/10/04  19:14 FAX 202 942 5999          ARNOLD & PORTER LLP #9                      ✆002

06-10-04  16:45   FROM-RODEY LAW FIRM                1-505-768-7385        T-118  P.02   F-003

DANIELA SANCHEZ

U3376

FIRST JUDICAL DISTRICT
COUNTY OF SANTA FE
STATE OF NEW MEXICO

No.: _D-010-CV-2000-1387_

ANNA M. ARAGON, SANDRA BRISCO,
JANE ANGEL-LOPEZ, YOLANDA ARCHULETA,
ALBERT BOOGNL, SAMANTHA GENTRY,
ALICIA BALL, BARBARA WALKER,
PAULA GENTHNER, BARBARA AYRES,
EFFIE THOMPSON-GOODEN, MARIA ATENCIO,
KATHY PADILLA GARDUNO, MIQUELA SANCHEZ,
JOSEPHINE GARCIA, CHARLENE PETERS,
ANDREW FRANCIS, IDA MUNIZ,
MARILYN FLORO, SALLY MOYA,
DANIEL FERRARI, FRUTOSO MONTOYA,
BELINDA MONTOYA, MELANIE FERGUSON,
CONSTANCE MOLECKE, ROSIE FALCON,
DARLA MICHAEL, GEORGETTA MEREDITH,
KAREN FAIRES, NELDA ESQUIBEL,
RAMONA MELENDEZ, TONY EPPS,
AMADEE DURAN, TERESA DUNCAN,
SANDTINA MAURER, MARY MARTINEZ,
ELIZABETH DECKER, CECILIA CUNEO,
LINDA CRAVENS-RODRIGUEZ, JERRY MARTINEZ,
GRACE MARTINEZ, IRENE COX,
MARY JANE MAHONEY, TAMMY LOGAN,
YOLANDA COOK, LOURDES CONLEY,
MARIA ELENA LEYBA, BRIT LAWRENCE,
SARA CONDITO, and RITA JENSEN,

       Plaintiffs,

vs.

WYETH-AYERST LABORATORIES DIVISION
OF AMERICAN HOME PRODUCTS CORPORTION,
a Delaware corporation, AMERICAN HOME PRODUCTS
CORPORATION, a Delaware corporation,
FRANCISCO M. ANAYA, and GEORGE EVETTS, M.D.,
a physician practicing in the State of New Mexico,

       Defendants.

000001

1

## PLAINTIFFS' COMPLAINT FOR PERSONAL INJURIES
## AND PUNITIVE DAMAGES

COMES NOW the Plaintiffs, Anna M. Aragon, Sandra Brisco, Jane Angel-Lopez,

Yolanda Archuleta, Albert Boognl, Samantha Gentry, Alicia Ball, Barbara Walker, Paula

Genthner, Barbara Ayres, Effie Thompson-Gooden, Maria Atencio, Kathy Padilla Garduno,

Miquela Sanchez, Josephine Garcia, Charlene Peters, Andrew Francis, Ida Muniz, Marilyn

Floro, Sally Moya, Daniel Ferrari, Frutoso Montoya, Belinda Montoya, Melanie Ferguson,

Constance Molecke, Rosie Falcon, Darla Michael, Georgetta Meredith, Karen Faires, Nelda

Esquibel, Ramona Melendez, Tony Epps, Amadee Duran, Teresa Duncan, Sandrina Maurer,

Mary Martinez, Elizabeth Decker, Cecilia Cuneo, Linda Cravens-Rodriguez, Jerry Martinez,

Grace Martinez, Irene Cox, Mary Jane Mahoney, Tammy Logan, Yolanda Cook, Lourdes

Conley, Maria Elena Leyba, Brit Lawrence, Sara Condito, and Rita Jensen, by and through their

attorneys of record, Caruso Law Offices P.C., by Mark J. Caruso, Law Offices of Edward W.

Moore, by Edward W. Moore, and Law Offices of Patrick Mulligan, by Patrick Mulligan, and

brings their claim for personal injuries and punitive damages against Defendants Wyeth-Ayerst

Laboratories, a division of American Home Products Corporation, a Delaware corporation,

American Home Products Corporation, a Delaware corporation, Francisco M. Anaya, and

George Evetts, M.D., and for their cause of action state as follows:

    1.  Plaintiff Anna M. Aragon is a resident of the County of Santa Fe, State of New

Mexico.

    2.  Plaintiff Sandra Brisco is a resident of the County of Chavez, State of New Mexico.

    3.  Plaintiff Jane Angel-Lopez is a resident of the County of San Miguel, State of New

Mexico.

000002

4. Plaintiff Yolanda Archuleta is a resident of the County of Chaves, State of New Mexico.

5. Plaintiff Albert Boognl is a resident of the County of San Juan, State of New Mexico.

6. Plaintiff Samantha Gentry is a resident of the County of Chaves, State of New Mexico.

7. Plaintiff Alicia Ball is a resident of the County of Bernalillo, State of New Mexico.

8. Plaintiff Barbara Walker is a resident of the County of Bernalillo, State of New Mexico.

9. Plaintiff Paula Genthner is a resident of the County of Valencia, State of New Mexico.

10. Plaintiff Barbara Ayres is a resident of the County of Bernalillo, State of New Mexico.

11. Plaintiff Effie Thompson-Gooden is a resident of the County of Dona Ana, State of New Mexico.

12. Plaintiff Maria Atencio is a resident of the County of Rio Arriba, State of New Mexico.

13. Plaintiff Kathy Padilla Garduno is a resident of the County of Santa Fe, State of New Mexico.

14. Plaintiff Miquela Sanchez is a resident of the County of Los Alamos, State of New Mexico.

15. Plaintiff Josephine Garcia is a resident of the County of Bernalillo, State of New Mexico.

000003

06/10/04  19:15 FAX 202 942 5999      ARNOLD & PORTER LLP #9                    ☒005

06-10-04  16:46   FROM-RODEY LAW FIRM                    1-305-768-7396       T-116  P.05/36  F-003

16. Plaintiff Charlene Peters is a resident of the County of Chaves, State of New Mexico.

17. Plaintiff Andrew Francis is a resident of the County of Bernalillo, State of New Mexico.

18. Plaintiff Ida Muniz is a resident of the County of Quay, State of New Mexico.

19. Plaintiff Marilyn Floro is a resident of the County of Bernalillo, State of New Mexico.

20. Plaintiff Sally Moya is a resident of the County of Bernalillo, State of New Mexico.

21. Plaintiff Daniel Ferrari is a resident of the County of Bernalillo, State of New Mexico.

22. Plaintiff Frutoso Montoya is a resident of the County of Bernalillo, State of New Mexico.

23. Plaintiff Belinda Montoya is a resident of the County of Santa Fe, State of New Mexico.

24. Plaintiff Melanie Ferguson is a resident of the County of McKinley, State of New Mexico.

25. Plaintiff Constance Molecke is a resident of the County of Bernalillo, State of New Mexico.

26. Plaintiff Rosie Falcon is a resident of the County of Lea, State of New Mexico.

27. Plaintiff Darla Michael is a resident of the County of Eddy, State of New Mexico.

28. Plaintiff Georgetta Meredith is a resident of the County of Chaves, State of New Mexico.

29. Plaintiff Karen Faircs is a resident of the County of Roosevelt, State of New Mexico.

4

000004

30. Plaintiff Nelda Esquibel is a resident of the County of Eddy, State of New Mexico.

31. Plaintiff Ramona Melendez is a resident of the County of Dona Ana, State of New Mexico.

32. Plaintiff Tony Epps is a resident of the County of Curry, State of New Mexico.

33. Plaintiff Amadee Duran is a resident of the County of Bernalillo, State of New Mexico.

34. Plaintiff Teresa Duncan is a resident of the County of San Juan, State of New Mexico.

35. Plaintiff Sanduna Maurer is a resident of the County of Grant, State of New Mexico.

36. Plaintiff Mary Martinez is a resident of the County of Santa Fe, State of New Mexico.

37. Plaintiff Elizabeth Decker is a resident of the County of Dona Ana, State of New Mexico.

38. Plaintiff Cecillia Cuneo is a resident of the County of Bernalillo, State of New Mexico.

39. Plaintiff Linda Cravens-Rodriguez is a resident of the County of Bernalillo, State of New Mexico.

40. Plaintiff Jerry Martinez is a resident of the County of Santa Fe, State of New Mexico.

41. Plaintiff Grace Martinez is a resident of the County of Bernalillo, State of New Mexico.

42. Plaintiff Irene Cox is a resident of the County of Bernalillo, State of New Mexico.

43. Plaintiff Mary Jane Mahoney is a resident of the County of Dona Ana, State of New Mexico.

000005

06/10/04  19:15 FAX 202 942 5999        ARNOLD & PORTER LLP #9                        ☑007

06-10-04  16:47   FROM-RODEY LAW FIRM                    1-505-768-7395      T-118  P.07/36  F-003

44. Plaintiff Tammy Logan is a resident of the County of Torrance, State of New Mexico.

45. Plaintiff Yolanda Cook is a resident of the County of Eddy, State of New Mexico.

46. Plaintiff Lourdes Conley is a resident of the County of Lea, State of New Mexico.

47. Plaintiff Maria Elena Leyba is a resident of the County of Santa Fe, State of New Mexico.

48. Plaintiff Brit Lawrence is a resident of the County of Bernalillo, State of New Mexico.

49. Plaintiff Sara Condito is a resident of the County of Otero, State of New Mexico.

50. Plaintiff Rita Jensen is a resident of the County of Bernalillo, State of New Mexico.

51. It is Plaintiffs' information and belief that Defendant Wyeth-Ayerst Laboratories Division of American Home Products Corporation (hereinafter "Wyeth-Ayerst") is a Delaware corporation and is licensed to do business in the State of New Mexico. At all relevant times this Defendant was in the business of marketing, distributing and selling prescription drugs in Santa Fe County, State of New Mexico, and it maintains its agent for service of process in Santa Fe County.

52. It is Plaintiffs' information and belief that Defendant American Home Products Corporation (hereinafter "American Home") is a Delaware corporation and is licensed to do business in the state of New Mexico. At all relevant times this Defendant was in the business of marketing, distributing and selling prescription drugs in Santa Fe County, State of New Mexico, and it maintains its agent for service of process in Santa Fe County.

53. It is Plaintiffs' information and belief that Defendant Francisco M. Anaya (hereinafter "Anaya") is the New Mexico sales manager for Defendants Wyeth-Ayerst and American Home

000006

06/10/04   19:16 FAX 202 942 5999          ARNOLD & PORTER LLP #9                    ☑008

06-10-04   16:47     FROM-RODEY LAW FIRM                    1-505-768-7395       T-118   P.08/36   F-003

for sales and distribution of Redux and Pondimin, and that Defendant Anaya is a resident of Chaves County, New Mexico.

54. It is Plaintiffs' information and belief that Defendant George Evetts, M.D. (hereinafter "Dr. Evetts") prescribed Pondimin and/or Redux to Ida Muniz, and that Defendant Dr. Evetts is a resident and citizen of Tucumcari County, New Mexico.

55. With respect to all claims and causes of action alleged herein, all corporate and partnership Defendants were at all relevant times acting by and through their respective directors, officers, agents, employees, servants, representatives and partners, all of whom were acting within the course and scope of their authority or apparent authority. Defendant Anaya was an employee of Defendants Wyeth-Ayerst and American Home and marketed and sold these drugs on behalf of Defendants within the state of New Mexico, and said Defendants are therefore vicariously liable. Anaya represented to physicians and pharmacies that the drugs were safe for their intended purpose. Anaya either knew or should have known that the Pondimin and/or Redux when used individually or in combination with Phentermine could cause primary pulmonary hypertension, pulmonary hypertension, heart valve damage, neurotoxicity and/or an increase risk of stroke. Anaya's individual acts and/or omissions were a producing and/or proximate cause of the personal injuries and disabilities suffered by the Plaintiffs herein.

56. Defendants manufactured, marketed, and/or distributed a drug known as Fenfluramine under the brand name of "Pondimin" and Dexfenfluramine under the brand name of "Redux".

57. This Court has jurisdiction over any non-resident Defendants because said Defendants transacted business and committed, in whole or in part, torts in New Mexico by

7                        000007

placing in the stream of commerce of sale, distribution and use, certain drugs known as "Pondimin" and "Redux" and their components, for use by the Plaintiffs herein. Said Defendants' contacts within New Mexico have been continuing and systematic throughout all times material herein, and they have contracted business in the such that they should have reasonably anticipated being called into court in New Mexico.

58. The Plaintiffs identified above are victims of the Defendants' Wyeth-Ayerst, American Home, and Anaya (hereinafter collectively referred to as "pharmaceutical company Defendants") decision to manufacture, market, design and/or distribute a combination of diet drugs known as "Pondimin", "Redux" and the fenfluramine ("fen") portion of the combination drug commonly known as ("fen-phen").

59. The pharmaceutical company Defendants knew or should have known the risk to Plaintiffs and others of taking such drugs.

60. The drugs cause heart and cardiological damage, heart valve problems, lung and pulmonary problems, neurotoxicity, brain damage and other medical problems similar to those that these Plaintiffs have experienced. The Plaintiffs have been diagnosed with heart damage and other problems and injuries which they never had before they took these drugs, and the Plaintiffs' medical problems are caused by "Pondimin" and/or "Redux."

61. Plaintiff Anna M. Aragon was prescribed Pondimin for weight loss from on or about April 1997 to June 1997.

62. Plaintiff Sandra Brisco was prescribed Pondimin for weight loss from on or about October 1996 to March 1997.

8

000008

06/10/04   19:16 FAX 202 942 5999          ARNOLD & PORTER LLP #9                      ☒010

06-10-04   18:49   FROM-RODEY LAW FIRM                    1-505-768-7395          T-119  P.10/36  F-003

63. Plaintiff Jane Angel-Lopez was prescribed Pondimin for weight loss from on or about March 1997 to June 1997.

64. Plaintiff Yolanda Archuleta was prescribed Pondimin for weight loss from on or about April 1996 to June 1997.

65. Plaintiff Albert Boognl was prescribed Redux for weight loss from on or about May 1997 to August 1997.

66. Plaintiff Samantha Gentry was prescribed Pondimin for weight loss from on or about July 1996 to March 1997.

67. Plaintiff Alicia Ball was prescribed Redux for weight loss from on or about October 1996 to December 1996.

68. Plaintiff Barbara Walker was prescribed Pondimin for weight loss from on or about August 1996 to June 1997.

69. Plaintiff Paula Genthner was prescribed Pondimin for weight loss from on or about August 1995 to April 1996.

70. Plaintiff Barbara Ayres was prescribed Pondimin for weight loss from on or about January 1997 to June 1997.

71. Plaintiff Effie Thompson-Gooden was prescribed Pondimin for weight loss from on or about June 1995 to October 1995.

72. Plaintiff Maria Atencio was prescribed Pondimin for weight loss from on or about June 1996 to September 1997.

73. Plaintiff Kathy Padilla Garduno was prescribed Pondimin for weight loss from on or about March 1997 to June 1997.

9

000009

06/10/04  19:16 FAX 202 942 5999       ARNOLD & PORTER LLP #9                    ☑011

06-10-04  16:52    FROM-RODEY LAW FIRM                1-505-768-7395        T-120  P.11/36  F-003

74. Plaintiff Miquela Sanchez was prescribed Pondimin for weight loss from on or about February 1997 to April 1997.

75. Plaintiff Josephine Garcia was prescribed Redux for weight loss from on or about April 1997 to September 1997.

76. Plaintiff Charlene Peters was prescribed Pondimin for weight loss from on or about December 1996 to August 1997.

77. Plaintiff Andrew Francis was prescribed Pondimin for weight loss from on or about January 1997 to May 1997.

78. Plaintiff Ida Muniz was prescribed Redux for weight loss from on or about July 1996 to March 1997.

79. Plaintiff Marilyn Floro was prescribed Redux and Pondimin for weight loss from on or about September 1996 to December 1996.

80. Plaintiff Sally Moya was prescribed Pondimin for weight loss from on or about October 1996 to July 1997.

81. Plaintiff Danielle Ferran was prescribed Pondimin for weight loss from on or about March 1997 to July 1997.

82. Plaintiff Fruroso Montoya was prescribed Pondimin for weight loss from on or about December 1995 to May 1997.

83. Plaintiff Belinda Montoya was prescribed Pondimin for weight loss from on or about November 1996 to January 1997.

84. Plaintiff Melanie Ferguson was prescribed Pondimin for weight loss from on or about March 1997 to June 1997.

000010

06/10/04  19:17 FAX 202 942 5999        ARNOLD & PORTER LLP #9                    ☑012

06-10-04  16:52   FROM-RODEY LAW FIRM                  1-505-768-7395      T-120  P.12/36  F-003

85. Plaintiff Constance Molecke was prescribed Pondimin for weight loss from on or about January 1997 to April 1997.

86. Plaintiff Rosie Falcon was prescribed Pondimin for weight loss from on or about February 1996 to July 1996.

87. Plaintiff Darla Michael was prescribed Pondimin for weight loss from on or about November 1996 to May 1997.

88. Plaintiff Georgetta Meredith was prescribed Redux and Pondimin for weight loss from on or about June 1996 to February 1997.

89. Plaintiff Karen Faires was prescribed Redux for weight loss from on or about June 1996 to August 1996.

90. Plaintiff Nelda Esquibel was prescribed Pondimin for weight loss from on or about January 1996 to March 1996.

91. Plaintiff Ramona Melendez was prescribed Redux for weight loss from on or about August 1996 to May 1997.

92. Plaintiff Tony Epps was prescribed Redux and Pondimin for weight loss from on or about June 1995 to September 1996.

93. Plaintiff Amadee Duran was prescribed Pondimin for weight loss from on or about February 1997 to April 1997.

94. Plaintiff Teresa Duncan was prescribed Pondimin for weight loss from on or about October 1995 to February 1997.

95. Plaintiff Sandrina Maurer was prescribed Pondimin for weight loss from on or about October 1996 to June 1997.

11                    000011

96. Plaintiff Mary Martinez was prescribed Pondimin for weight loss from on or about March 1997 to May 1997.

97. Plaintiff Elizabeth Decker was prescribed Pondimin for weight loss from on or about May 1997 to July 1997.

98. Plaintiff Cecillia Cuneo was prescribed Pondimin for weight loss from on or about July 1996 to September 1996.

99. Plaintiff Linda Cravens-Rodriguez was prescribed Pondimin for weight loss from on or about August 1996 to October 1996.

100.   Plaintiff Jerry Martinez was prescribed Pondimin for weight loss from on or about January 1997 to March 1997.

101.   Plaintiff Grace Martinez was prescribed Redux for weight loss from on or about August 1996 to September 1997.

102.   Plaintiff Irene Cox was prescribed Redux and Pondimin for weight loss from on or about July 1995 to May 1997.

103.   Plaintiff Mary Jane Mahoney was prescribed Redux for weight loss from on or about November 1996 to January 1997.

104.   Plaintiff Tammy Logan was prescribed Redux for weight loss from on or about June 1997 to August 1997.

105.   Plaintiff Yolanda Cook was prescribed Redux and Pondimin for weight loss from on or about March 1995 to January 1997.

106.   Plaintiff Lourdes Conley was prescribed Pondimin for weight loss from on or about March 1997 to June 1997.

000012

107.  Plaintiff Maria Elena Leyba was prescribed Redux for weight loss from on or about February 1997 to May 1997.

108.  Plaintiff Brit Lawrence was prescribed Redux for weight loss from on or about February 1996 to April 1996.

109.  Plaintiff Sara Condito was prescribed Redux and Pondimin for weight loss from on or about May 1996 to March 1997.

110.  Plaintiff Rita Jensen was prescribed Redux for weight loss from on or about September 1996 to November 1996.

111.  All Plaintiffs have suffered personal injuries, fear of personal injuries, disabilities and other damages as a direct result of the prescription and use of the drugs.

112.  The drugs used by Plaintiffs were defective and dangerous.

113.  The drugs and the acts or omissions of pharmaceutical company Defendants were the producing cause, or alternatively, the proximate cause of the personal injuries, disabilities and other damages suffered by the Plaintiffs.

I

## STRICT LIABILITY

### Section 402A and 402B of Restatement (Second) of Torts.

114.  The pharmaceutical company Defendants were at all relevant times engaged in designing, developing, testing, inspecting, promoting, advertising, manufacturing, marketing and/or distributing the drugs and the components of such which they sold to various health care providers and pharmacies for use by patients as ultimate consumers throughout the United States, including New Mexico.

13

000013

06-10-04  16:52    FROM-RODEY LAW FIRM              1-505-768-7395        T-120  P.15/36  F-003

115.   While said Defendants were engaged in the designing, testing, inspecting, manufacturing, marketing, distributing and/or selling such drugs and the components of such, said Defendants sold the drugs to health care providers for use by and resale to the consuming public, including the Plaintiffs.

116.   The drugs were in the condition in which they existed when said Defendants sold and delivered the drugs for distribution to the health care providers and pharmacies.

117.   Said Defendants expected the drugs sold by them to reach consumers, including the Plaintiffs, in the condition in which they sold them.

118.   Said Defendants manufactured, marketed, distributed and/or sold the drugs while they were in a defective condition and were dangerous and defective in design and manufacture.

119.   By reason of these defects, the products were dangerous to the user, including the Plaintiffs, who sustained injuries from using the defective drugs.

120.   Said Defendants further misrepresented the character of the drugs' quality and safety, and the Plaintiffs as a users of the product relied on such misrepresentations of facts.

121.   The drugs were also defective by reason of inadequate warnings and instructions by said Defendants, and over-promotion and marketing negated any warnings, if any, provided by said Defendants.

122.   The drugs were dangerous in that Defendants:

(a)    specified or used untested or inadequately tested components for use in the drugs;

(b)    used contaminated or adulterated components in the manufacturing process;

(c)    failed to adequately test the drugs and/or their components thereof;

14

000014

06/10/04  19:18 FAX 202 942 5999        ARNOLD & PORTER LLP #9                    ☒016

06-10-04  16:53    FROM-RODEY LAW FIRM              1-505-768-7395      T-120  P.16/36  F-003

(d)     failed to promptly and adequately notify the Plaintiffs of the risks associated with the use of the drugs and failed to adequately advise Plaintiff's health care providers and pharmacists of such risks;

(e)     failed to give full, proper, and warnings and instructions to Plaintiffs or their health care providers and pharmacists with regard to possible hazards and/or side effects resulting from taking these drugs;

(f)     caused Plaintiffs to be exposed to substances which caused their respective diseases;

(g)     designed, manufactured, and marketed the prescribed drugs and their component parts;

(h)     failed to inform Plaintiffs as well as the general public of the inherent risks associated with the use the and/or failed to advise Plaintiffs regarding the asking of serious questions about the side effects of the drug which were known in the medical and scientific communities at the time these drugs were marketed;

(i)     failed to perform proper and sufficient pre-marketed test;

(j)     failed to make safe drugs;

(k)     failed to release or reveal the results of all clinical and/or laboratory tests performed on the drugs, and in certain instances, misrepresented testing being done and/or the results therefor;

(l)     represented that the drugs were fit for the particular purpose for which they were sold when they were not;

(m)    represented that the drugs were of merchantable quality when they were not;

15                      000015

(n)   represented that the drugs were safe medical drugs;

(o)   represented that the drugs were harmless to humans and/or that there were no serious safety concerns existing in the medical and scientific communities regarding these drugs;

(p)   represented that long-term safety studies had been conducted with regard to these drugs when they had not been conducted;

(q)   misrepresented test results;

(r)   represented that the drugs and other chemicals in the drugs had been adequately tested so as to assure their efficacy and safety, when such adequate testing had not in fact, been done;

(s)   failed to disclose findings made by the scientific community inconsistent with positions previously taken;

(t)   failed to comply with the applicable provisions of the Uniform Commercial Code, the New Mexico Drug, Device and Cosmetic Act, the New Mexico Unfair Trade Practices Act, and other applicable state law;

(u)   marketed the drugs when it was dangerous for use as designed and/or manufactured and/or marketed;

(v)   utilized improper manufacturing techniques to insure a reasonably safe product;

(w)   failed to disclose the Defendants were utilizing improper manufacturing techniques;

(x)   failed to disclose that Defendants have undertaken no or inadequate testing;

000016

16

(y)   failed to disclose that Defendants had material information regarding the risks associated with taking the drugs which would have had the effect of possibly causing an individual to elect not to take the drugs if such information had been disclosed;

(z)   failed to disclose that Defendants had material clinical and laboratory test results available regarding the risks of the drugs which would have had the effect of possibly causing an individual to elect not to take the drugs if such information had been disclosed;

(aa)  failed to disclose that Defendants had undertaken a calculated and premeditated course of action to mislead the public, as well as governmental authorities including the Food and Drug Administration regarding the safety of the drugs and their suitability for use;

(bb)  undertook a concerted effort to keep the public confused about the risks and hazards associated with use of the drugs so as to permit Defendants the opportunity to continue selling the drugs and thereby generate profits from such sales;

(cc)  caused confusion or misunderstanding as to the source, sponsorship, approval, and/or certification of the drugs;

(dd)  falsely represented that the drugs had sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they did not have;

(ee)  made false and misleading representations to doctors, pharmacists and distributors;

17

000017

(ff)   advertised the drugs with the intent not to sell them as advertised;

(gg)   failed to disclose material information concerning the drugs that was known at the time of the sale of the drugs with the intention of inducing Plaintiffs into a transaction which Plaintiffs would not have entered into had the information been disclosed;

(hh)   over-marketed and/or over-promoted the drug;

(ii)   had a duty to notify users of adverse reactions, but failed to do so (Defendants knew of the foreseeable risk of harm from the drugs and the fact they knew that most health care providers never discussed with their patients any of the possible side effects or adverse reactions known to be associated with prescriptions of the drugs);

(jj)   disseminated a product brochure which contained misrepresentations to health care providers about the safety of the drugs and;

(kk)   failed to conduct altitude studies to determine the effect of the drugs on Plaintiffs and others in higher altitudes versus lower altitudes.

123.   Such products were defective and dangerous when they were marketed, distributed and sold by Defendants at the time it reached the Plaintiffs. The defects and dangerous conditions of such products were a producing cause of the Plaintiffs' severe and permanent personal injuries and other damages.

124.   The products were being used by the Plaintiffs for their ordinary and intended purpose and in the ordinary, intended and prescribed manner.

18

000018

125.    Plaintiffs were not aware of the drugs' defective conditions when they consented to their use, and the defective conditions were not observable by the Plaintiffs who lack technical knowledge and skill to understand the design, manufacture, or characteristics of these drugs.

126.    Plaintiffs relied upon Defendants to deliver the drugs in a condition fit for use for the purposes for which they were intended, free of defect.

127.    The defective condition and the misrepresentation as to the drugs were a producing causes of injuries and damages sustained by the Plaintiffs, as set forth below.

128.    By reason of the above and foregoing circumstances and conditions, pharmaceutical company Defendants are strictly liable, jointly and severally, for the injuries and damages caused to the Plaintiffs by the defects in the drugs and the components of such by virtue of Section 402A and 402B of the Restatement (Second) of Torts and other applicable law.

## II
## NEGLIGENCE

129.    At all times material hereto, pharmaceutical company Defendants were engaged in the designing, testing, inspecting, manufacturing, marketing, distributing, warning and selling of the drugs and the components of such, including the drugs which were sold to Plaintiffs.

130.    Said Defendants owe the Plaintiffs and the public a duty to use reasonable care in designing, testing, inspecting, manufacturing, marketing, distributing and selling of the drugs and the components of such and in warning of the dangers in using the drugs identified herein and the components of such.

131.    Said Defendants breached such duties owed to Plaintiffs and were negligent in performing their duties.

000019

19

132. Plaintiffs assert the doctrine of *res ipsa loquitur* under this negligence in performing their duties.

133. Defendants were negligent in that:

(a)  Plaintiffs adopt and incorporate the allegations contained herein above.

(b)  There were no satisfactory explanations of most, if not all, reported incidences of heart valve disease and /or primary pulmonary hypertension and/or neurotoxicity; and

(c)  Defendants operated below the standard of care in failing to adequately warn Plaintiffs, their families and/or treating physician(s) and/or pharmacists within a reasonable time that Plaintiffs may have been protected from the risks associated with these drugs.

134. The acts and/or omissions of said pharmaceutical company Defendants were a proximate cause of Plaintiffs' damages as set forth below.

### III
### NEGLIGENCE PER SE

135. By reason of their acts and/or omissions as alleged herein, said pharmaceutical company Defendants violated provisions of the New Mexico Drug, Device and Cosmetic Act, Section 26-1-1 seq. NMSA 1978, by manufacturing, selling and/or misbranded and misrepresented into the stream of commerce in the state of New Mexico.

136. As a direct and proximate result of Defendants' regulatory violations, Plaintiffs are members of the class protected by the above-mentioned statutes and regulations and have sustained damages and injuries as set forth below.

20

000020

IV

## GROSS NEGLIGENCE

137.   Pharmaceutical company Defendants herein have consciously and knowingly acted with indifference to the rights, welfare, and safety of the Plaintiffs, and such acts and/or omissions of said Defendants are so egregious and done, and/or omitted, with an entire want of care as to the amount to gross negligence which is a proximate cause of Plaintiffs' damages, and therefore Plaintiffs are entitled to an award of exemplary and punitive damages as set forth below.

V

## UNFAIR TRADE PRACTICES

138.   Plaintiffs seek to recover damages against all pharmaceutical company Defendants pursuant to the provisions of New Mexico Unfair Trade Practices Act 57-12-1 et seq. ("UTPA") upon the grounds that the acts and practice of said Defendants as described herein are prohibited by said statute.

139.   At all relevant times, said Defendants were engaged in "Trade" and "Commerce" as defined in the UTPA. Plaintiffs are protected under the statute because Plaintiffs sought or acquired goods or services in the transaction giving rights to her claims as defined under UTPA.

140.   Defendants are engaged in false, misleading or deceptive acts and/or practices in the conduct of its trade or commerce with the Plaintiffs which is a producing cause of Plaintiffs' damages in that they particularly:

    (a)   presented false, misleading and/or deceptive acts or practices in the  conduct of trade or commerce;

21

000021

(b)  represented that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they did not have;

(c)  represented that goods or services were of a particular standard, quality or grade, or that the goods were of particular style or model when in fact they were of another;

(d)  represented that a guaranty or warranty conferred or involved rights or remedies which it did not have or involve;

(e)  failed to disclose information concerning the goods or services which was known at the time of the transaction, and such failure to disclose was intended to induce Plaintiffs into a transaction into which the Plaintiffs would not have entered into had the information been disclosed; and

(f)  Defendants breached any express or implied warranty.

141.  Defendants have engaged in an unconscionable conduct or courses of conduct that were the producing cause of damages to Plaintiffs.

142.  The conduct of said Defendants in engaging in false, misleading and deceptive acts or course of conduct, and their unconscionable course of conduct, was all done knowingly. Pleading further and/or in the alternative, Plaintiffs state that the misrepresentations of said Defendants, even if not made knowingly, were made in violation of the UTPA which sections do not require the mental culpability of intent. Said misrepresentations were made directly or indirectly to Plaintiffs who relied on them to their detriment and damage.

143.  The unlawful acts and practices of said Defendants justifies an amount of money which, would fairly and reasonably compensate Plaintiffs for the damages as set forth below:

22

000022

144.   Pursuant to UTPA, Plaintiffs are further entitled to statutory damages, punitive and exemplary damages, attorney fees and costs.

## VI

## FRAUD/NEGLIGENT MISREPRESENTATION

145.   Pharmaceutical company Defendants manufactured, marketed and/or distributed the drugs which are the subject of this suit and the components of such drugs.

146.   Plaintiffs are members of the general public for whose use, as an ultimate consumer, the drugs were manufactured, marketed and/or distributed by Defendants.

147.   Defendants made misrepresentations expressly and impliedly before and after the Plaintiffs purchased the drugs through their promotion, advertising, marketing, distribution, and statements to the general public including the Plaintiffs concerning the quality and character of the drugs and the components of such in that among other things:

(a)   Plaintiffs adopt all the allegations contained herein above;

(b)   Defendants knew they had previously caused members of the general public to develop heart valve disease and/or pulmonary hypertension by distributing the drugs;

(c)   Defendants concealed the fact that they knew the drugs had previously caused members of the general public to develop heart valve disease and/or pulmonary hypertension by distributing the drugs;

(d)   The drug were not fit for the particular purposed for which they were sold;

(e)   The drugs were not of merchantable quality;

u00023

23

(f)     Defendants fraudulently misrepresented the results of the studies of other doctors
        and scientists with regard to these drugs;

(g)     Defendants fraudulently represented that the drugs were safe, knowing that
        members of the general public would not purchase these products if they knew the
        truth;

(h)     Defendants had material information regarding the risks of the drugs which would
        have the effect of causing members of the general public not to elect to have taken
        the drugs were such information disclosed;

(i)     Defendants had material clinical and laboratory test results with regard to these
        drugs available to them or, such information was known or made known to them,
        regarding the risks involved in using the drugs, which would have had the effect
        of causing unsuspecting patients/consumers not to elect to have taken these drugs
        had such information been disclosed; and

(j)     Defendants undertook a calculated and premeditated course of action intended to
        mislead the public, as well as government authorities, regarding the safety of the
        drugs and their suitability for public use.

148.    Defendants' misrepresentations were made with the intent that they would reach
members of the general public and induce purchase of these drugs. Representations made by
said Defendants were false and made with the knowledge that they were false with reckless
disregard of the truth thereof.

149.    The misrepresentations were further reiterated and disseminated by said
Defendants through their directors, officers, agents, representatives, servants, employees and

24                      000024

sales representatives acting within the course and scope of their authority or apparent authority to merchandise, distribute and market the drugs.

150.    Misrepresentations by Defendants were made with the intent that the general public, including Plaintiffs, would rely on them, and made with knowledge of the falsity of said misrepresentations with reckless disregard of the truth thereof and/or were negligent.

151.    Said Defendants further negligently misrepresented the safety and risks of use of the drugs and failed to inform the Plaintiffs of the risks of the use of the drug.

152.    Plaintiffs purchased the drug in reliance on the truth of these negligent misrepresentations. Plaintiffs had no knowledge or means of discovering the defective condition of the drugs or the components of such, and they relied completely upon their representations of safety.

153.    Plaintiffs used the drugs for the purpose intended.

154.    Defendants' representations as to the safety of the drugs and the components of same were false, fraudulent and/or negligent, and said drugs were, in fact, dangerous.

155.    The false, fraudulent and/or negligent misrepresentation of Defendants were a proximate cause of Plaintiffs' injuries and damages, as set forth below.

## VII

## BREACH OF EXPRESS AND IMPLIED WARRANTIES

156.    Pharmaceutical company Defendants and/or their respective agents, employees and servants designed and/or manufactured and/or marketed and/or sold and/or warranted the drug.

000025

06/10/04  19:21 FAX 202 942 5999    __ ARNOLD & PORTER LLP #9                                ☑027

08-10-04  16:57    FROM-RODEY LAW FIRM                    1-505-768-7395        T-121  P.27/36  F-003

157.    Said Defendants made express and/or implied warranties regarding the drugs including warranties that:

    (a)    Plaintiffs adopt all the allegations herein above;

    (b)    The drugs were fit for the particular purpose for which they were sold;

    (c)    The drugs were of a merchantable quality;

    (d)    The drugs were safe for use by humans;

    (e)    The drugs, in the particular formulation and in the dosage prescribed to the Plaintiffs, were fit for the particular purpose for which they were sold, and were of merchantable quality;

    (f)    The drugs had been adequately tested so as to assure their efficacy and safety.

158.    Said Defendants breached express and implied warranties of fitness for a particular purpose.

159.    Said Defendants breached express and implied warranties of merchantability.

160.    Defendants breached these and other express and/or implied warranties in their sale of the drugs and such breaches were a producing and/or a proximate cause of the damages suffered by Plaintiffs as set forth below.

## VIII

## FRAUDULENT CONCEALMENT

161.    Pharmaceutical company Defendants had a duty to disclose the harmful effects of the drugs to the general public including Plaintiffs, and said pharmaceutical company Defendants have concealed and continue to conceal the harmful effects of the drugs that, among other things:

000026

(a)     Plaintiffs adopt all allegations contained herein above;

(b)     Had previously caused recipients to develop heart valve disease and/or primary pulmonary hypertension;

(c)     Were not fit for the particular purpose for which they were sold;

(d)     Were not of merchantable quality;

(e)     Fraudulently represented the results of the studies of other doctors and scientists with regard to the drug;

(f)     Fraudulently represented that the drugs was safe, knowing that individuals would not purchase the product if they were told the truth;

(g)     Had material information regarding the risks of the drugs which would have had effect of causing individuals not to elect to have taken the drugs were such information disclosed.

(h)     Had material clinical and laboratory test results with regard to the drugs available to them, or was known or made known to them, regarding the risks involved in using these drugs, which would have had the effect of causing individuals not to elect to have taken these drugs were such information disclosed; and/or

(i)     Had undertaken a calculated and premeditated course of action intended to mislead the public, as well as government authorities regarding the safety of these drugs and their suitability for use.

162.   The fraudulent concealment by said Defendants was conducted with the intent that it would shield the truth from consumers such as Plaintiffs.

000027

163.    Fraudulent concealment was conducted by said Defendants through their directors, officers, agents, representatives, servants, or employees acting within the course and scope of their authority to design, manufacture, test, merchandise, distribute and/or market the drugs.

164.    Defendants' fraudulent concealment was a proximate cause of Plaintiff's injuries and damages, as set forth below.

## IX
## CONSPIRACY

165.    Plaintiffs would further show that pharmaceutical company Defendants were engaged in a conspiracy to defraud and mislead the public by promoting a fad drug known as "fen-phen". Through concert of action and common design or plan, these Defendants acted together to commit an unlawful act and/or accomplish an illegal purpose and/or lawful purpose by unlawful means.

166.    Defendants' promotion of "fen-phen", the use of fenfluramine and/or dexfenfluramine in combination with phentermine, was widely known by Defendants, and Defendants conspired to actively encourage, and/or failed to warn Plaintiffs that the individual and/or combination use of these drugs could be hazardous, was not recommended, and had not been systematically tested by appropriate clinical trials and further concealed known serious side effects from physicians, pharmacists and consumers for profit.

167.    The conduct of said Defendants was a proximate or producing cause of substantial and permanent damages to Plaintiffs, for which Plaintiffs claim damages as set forth below.

000028

06/10/04   19:21 FAX 202 942 5999    ARNOLD & PORTER LLP #9    ☑030

05-10-04   16:58   FROM-RODEY LAW FIRM    1-505-768-7385    T-121   P.30/35   F-003

## X

## PRE-EXISTING CONDITION

168.    To the extent that Plaintiffs are suffering from any pre-existing condition which plays any part in the injuries and damages made the basis of this suit, Plaintiffs would show that such pre-existing condition was aggravated by the incident and injuries caused by pharmaceutical company Defendants.

## XI

## DISCOVERY RULE

169.    In response to Defendants who have or may hereafter assert that Plaintiffs' claims are barred by applicable statutes of limitations, Plaintiffs plead as follows:

170.    Plaintiffs hereby invoke the discovery rule and would show that they did not know that they had an injury or disease, nor should they have known that they had an injury or disease until less then three (3) years before the filing of their Complaint herein.

171.    In the alternative, if it be determined that the Plaintiffs knew, or in the exercise of reasonable care should have known, that they had an injury or disease, Plaintiffs will show that they did not know and should not have known that their injuries or diseases were caused by exposure to these drugs until less then three (3) years before the filing of their Complaint herein.

172.    In the alternative, if Defendants claim that they had not discovered that the drugs caused injuries and/or health risks to Plaintiffs as a result of their respective activities and/or omissions at the time of filing the Complaint, thus, likewise, Plaintiffs should not be deemed to

000029

have acquired such knowledge so as to preclude their causes of action asserted herein. Said Defendants are therefore estopped from asserting any statute of limitations defense.

173.    In the alternative, Plaintiffs allege that due to the continuous, repeated nature of the pharmaceutical company Defendants' acts and/or omissions which have not desisted, Defendants committed a "continuing tort" and said Defendants are therefore estopped from asserting a statute of limitations defense.

174.    Furthermore, Plaintiffs allege that Defendants had a duty to disclose the harmful effects of their defective products to Plaintiffs, and Defendants have concealed and continue to conceal the existence of such causes of action from Plaintiffs and thus, have tolled and continue to toll the statute of limitations as to these Plaintiffs.

## DAMAGES

175.    Defendants' acts and/or omission as alleged herein are the proximate cause and/or a producing cause of the severe bodily injuries, fear of bodily injuries, disabilities and physical impairment the Plaintiffs have suffered in the past and will suffer in the future, the severe mental and physical pain, stress and anguish Plaintiffs have experienced and will continue to experience for the rest of their natural life, the hospitalization and medical expenses Plaintiffs have incurred to date and will incur in the future, valvular heart disease where one or more heart valves is thickened and/or blood regurgitates as set forth in the records of our cardiologist; risk of bacterial endocarditis; increased risk of stroke; lesions on the valves of the heart; elevated pulmonary artery pressure; increased risk of pulmonary hypertension; increased risk of heart attack,

30

increased risk of death, probable changes in the lining of small lung arteries, serotonergic damage to the 5-HT receptors in both the heart and brain (which may result in cognitive difficulties, memory deficits, sleep disorders, and mood irregularity especially depression, anxiety, panic disorder, and impulsivity), incidence or aggravation of the following: shortness of breath, dizziness, anxiety, diminished cardiac function, chest pain, new heart murmur, swelling of the feet or legs, fatigue, fainting, the loss of earnings and loss of earnings capacity Plaintiffs will sustain in the future and the loss of household services Plaintiffs have sustained in the past and will sustain in the future.

176.    Plaintiffs seek recovery form the Defendants, jointly and severally, for all of their damages as described above.

177.    Pharmaceutical company Defendants consciously and knowingly acted with conscience indifference to the rights, welfare, and safety of Plaintiffs, and such acts and/or omissions of the Defendants were so egregious, willful and wanton, that Plaintiffs are entitled to an award of punitive and exemplary damages from pharmaceutical company Defendants, jointly and severally.

WHEREFORE, Plaintiffs pray for judgment against the Defendants, jointly and severally, for their damages as alleged herein, for punitive and exemplary damages, for damages as allowed under the UTPA and other applicable state laws, for pre-judgment and post-judgment

000031

06/10/04  19:22 FAX 202 942 5999    ARNOLD & PORTER LLP #9    ☒033

06-10-04  16:58    FROM-RODEY LAW FIRM    1-505-768-7385    T-121  P.33/35  F-003

interest as provided by law, for all costs of court, for reasonable attorneys' fees and for such other and further relief to which Plaintiffs may by entitled and his Court deems proper.

Respectfully submitted,

CARUSO LAW OFFICES, P.C

Mark L. Caruso, Esq.
Attorneys for Plaintiffs
4302 Carlisle Blvd., NE
Albuquerque, New Mexico 87107
Telephone:  (505) 883-5000
Facsimile:   (505) 883-5012

Of Counsel:

Patrick Mulligan, Esq.
Law Offices of Patrick Mulligan
2651 North Harwood, Suite 250
Dallas, Texas 75201
Telephone: (214) 969-0590
Facsimile:  (214) 969-1850

Edward W. Moore, Esq.
Law Offices of Edward W. Moore
2651 North Harwood, Suite 310
Dallas, Texas 75201
Telephone: (214) 871-9444
Facsimile:  (214) 871-3133

32

U00032

06/10/04  19:22 FAX 202 942 5999      ARNOLD & PORTER LLP #9                    ☒034

06-10-04  16:59   FROM-RODEY LAW FIRM               1-505-768-7395      T-121  P.34/36  F-003

FIRST JUDICAL DISTRICT
COUNTY OF SANTA FE
STATE OF NEW MEXICO

No.: D-0101-CV-200001587

ANNA M. ARAGON, et al.,

      Plaintiffs,

vs.

WYETH-AYERST LABORATORIES DIVISION
OF AMERICAN HOME PRODUCTS CORPORTION, et al.,

      Defendants.

## SUMMONS
### THE STATE OF NEW MEXICO

TO:  Wyeth-Ayerst Laboratories
     a Division of American Home Products Corporation,
     c/o Prentice Hall Corporation System, Inc.
     121 East Palace Avenue
     Santa Fe, New Mexico 87501

    Defendant Wyeth-Ayerst Laboratories a Division of America Home Products
Corporation, Greetings:
        This summons notifies you that a complaint has been filed against you. You are
required to file an Answer to the Complaint or a responsive motion within THIRTY DAYS
AFTER THE SUMMONS HAS BEEN SERVED ON YOU. You must file the Answer or
responsive motion with the Clerk of the District Court and you must serve a copy of the Answer
or responsive motion on the opposing party.

     · IF YOU DO NOT FILE AND SERVE AN ANSWER OR RESPONSIVE MOTION
WITHIN THE THIRTY DAY PERIOD, A DEFAULT JUDGEMENT MAY BE ENTERED
AGAINST YOU FOR THE MONEY OR OTHER RELIEF DEMANDED IN THE
COMPLAINT.

Address of District Court: First Judicial District Court, P.O. Box 2268, Santa Fe, New Mexico,
87504-2268.

000033

05-10-04  16:59    FROM-RODEY LAW FIRM                    1-505-768-7395        T-121  P.35/36  F-003

Name and address of Plaintiffs' attorneys: Mark J. Caruso, Caruso Law Offices, P.C., 4302
Carlisle, N.E., Albuquerque, New Mexico 87107, (505) 883-5000, Patrick Mulligan, Law
Offices of Patrick Mulligan, 2651 North Harwood, Suite 260, Dallas, Texas 75201, (214) 969-
0590, Edward W. Moore, 2651 North Harwood, Suite 310, Dallas, Texas 75201, (214) 871-
9444.

    WITNESS the Honorable _DANIELA. SANCHEZ_____, District judge of said
Court of the State of New Mexico and the Seal of the District Court of said County, this
_5_ day of _June_, 2000.

                                JOANN VIGIL QUINTANA
                                CLERK OF THE DISTRICT COURT

(SEAL)

                By:_____
                     Deputy  Clerk

000034

06/10/04   19:23 FAX 202 942 5999        ARNOLD & PORTER LLP #9                              ☑036

06-10-04   16:59     FROM-RODEY LAW FIRM                    1-505-768-7305      T-121   P.36/36   F-003

STATE OF NEW MEXICO           )
                             ) ss.
COUNTY OF_____    )

     I, being duly sworn, on oath, say that I am over the age of 18 years and not a party to this lawsuit, and that I served the within Summons in said County on the _____ day of _____, 20_____, by delivering a copy thereof, with copies of the Complaint/Amended Complaint and/or Notice of Lis Pendens attached, in the following manner:

(check one bow and fill in appropriate blanks)

___   To Defendant_____ (used when Defendant receives
      copy of Summons or refuses to receive Summons).

___   To _____, a person over fifteen (15) years of age
      and residing at the usual place of abode of Defendant _____, who
      at the time of such service was absent therefrom.

___   By posting a copy of the Summons and Complaint in the most public part of the premises
      of Defendant _____ (used if no person found at dwelling house
      or usual place of abode).

___   To _____, an agent authorized to receive service
      of process for Defendant _____.

___   To _____ (parent) (guardian) of
      Defendant_____ (used when Defendant is a minor or an
      incapacitated person).

___   To _____, _____
      (title of person authorized to receive process) (used when Defendant is a corporation of
      association subject to a suit under a common name, a land grant board of trustees, the
      State of New Mexico or any political subdivision).

Fees: $ _____        _____
                      Signature of Person Making Service

                      _____
                      Title, if any

     Subscribed and sworn to before me this _____ day of_____, 20___.

My Commission Expires:

_____        _____
                      Notary Public     **000035**